# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CANDY Q. MOORE,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>CALIFORNIA DEPARTMENT<br>OF CORRECTIONS AND<br>REHABILITATION,<br><br>　　　　　Defendant.<br>_____ / | CASE NO. CV F 10-1165 LJO SMS<br><br>**DECISION ON CDCR'S SUMMARY<br>JUDGMENT MOTION**<br>(Doc. 69.) |

## INTRODUCTION

Defendant California Department of Corrections and Rehabilitation ("CDCR") seeks summary judgment on pro se plaintiff Candy Q. Moore's ("Ms. Moore's") Title VII[1] hostile environment and retaliation claims arising during her temporary nursing stint at CDCR's Valley State Prison for Women ("VSPW"). Ms. Moore filed papers which offer no meaningful opposition to summary judgment for

---

[1] Ms. Moore's claims proceed under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. sections 2000e, et seq.

1

CDCR. This Court considered CDCR's summary judgment motion on the record[2] without a hearing, pursuant to Local Rule 230(g). For the reasons discussed below, this Court GRANTS CDCR summary judgment.

## BACKGROUND

### Summary

Ms. Moore is black and during March 5, 2007 to January 4, 2008 performed Licensed Vocational Nursing ("LVN") services on a temporary relief basis at VSPW through Supplemental Health Care Services, Inc. ("SHC"), a nursing registry which contracted with CDCR to supply temporary nurses. Ms. Moore claims that she was subject to a hostile work environment and retaliation for filing discrimination/retaliation complaints. CDCR seeks summary judgment in the absence of facts to support Ms. Moore's claims.

### Ms. Moore's SHC Employment

SHC, not CDCR, employed Ms. Moore subject to SHC's ability to provide Ms. Moore available work to satisfy requirements of SHC clients, such as CDCR. CDCR and Ms. Moore entered into no contract, and Ms. Moore was not guaranteed assignments to particular prison locations or shifts. VSPW was free to terminate the services of an SHC employee and treated temporary nurses as floaters.

### August 30, 2007 Alarm Pressing Incident

On August 30, 2007, Charles Funch ("Mr. Funch"), a white CDCR-employed nurse, attempted to stop Ms. Moore's dressing change of an inmate at the VSPW B Yard medical clinic[3] because Mr. Funch wanted to count narcotics. Mr. Funch told Ms. Moore if she did not have the inmate leave immediately, he would press his alarm to which correctional officers responded ("alarm incident"). Mr. Funch made no racist remarks to Ms. Moore. Ms. Moore did not tell then VSPW Director of Nursing

---

[2] This Court carefully reviewed and considered the record, including all evidence, arguments, points and authorities, declarations, testimony, statements of undisputed facts and responses thereto, objections and other papers filed by the parties. Omission of reference to evidence, an argument, document, objection or paper is not to be construed to the effect that this Court did not consider the evidence, argument, document, objection or paper. This Court thoroughly reviewed, considered and applied the evidence it deemed admissible, material and appropriate for summary judgment. This Court does not rule on evidentiary matters in a summary judgment context, unless otherwise noted.

[3] VSPW medical facilities are divided into A, B, C, and D Yards. LVNs work either a first (2 a.m. to 10 a.m.), second (10 a.m. to 6 p.m.), or a third (6 p.m. to 2 a.m.) shift. The second shift is referred to as the day shift and the third shift is referred to as the pm shift.

2

Judy Tucker ("Ms. Tucker") or Ms. Moore's supervisor Curtis Mangram ("Mr. Mangram")[4] that Ms. Moore believed that Ms. Funch pressed the alarm because Ms. Moore is black and that he disliked blacks. Ms. Moore's type-written and signed statement of the alarm incident made no reference to race.

Mr. Funch was transferred from his regular B Yard post to the medical records unit where he was ineligible to volunteer for overtime during investigation of the alarm incident, which included an interview of Ms. Moore. Prior to the alarm incident, Mr. Funch frequently had volunteered for overtime. LVN Connie Struble told Ms. Moore that Mr. Funch was angry with Ms. Moore because Mr. Funch lost four to six weeks of overtime.

### Mr. Funch's Return To B Yard

On October 16, 2007, Mr. Funch returned to his regular B Yard position and began to complain to Ms. Tucker and supervisors as to Ms. Moore's inadequate job performance and harassment of Mr. Funch. Ms. Moore claims that on Mr. Funch's first day back at B Yard, Mr. Funch awaited her in the dark at the beginning of their shift, and Ms. Moore was frightened because Mr. Funch did not do anything. Ms. Moore has no clue what Mr. Funch was doing in the dark before she arrived.

During the following week, Mr. Funch telephoned supervisors to complain about Ms. Moore and threatened to file a union grievance. Ms. Moore attributes Mr. Funch to have said that he is a state, union worker and "[s]he needs to leave." Ms. Moore claims that Mr. Funch called her a liar and lazy and slammed the door on her.

### Ms. Moore's Reassignment Off B Yard

Mr. Mangram advised Ms. Tucker that although Mr. Funch was often rude and disrespectful, there was an unusual level of conflict between Mr. Funch and Ms. Moore that he attributed to a personality conflict. Mr. Mangram and other supervisors reported to Ms. Tucker that the conflict disrupted B Yard medical staff. On October 21, 2007, Ms. Tucker decided to separate Ms. Moore and Mr. Funch to end the B Yard disruption, and Ms. Moore was reassigned to VSPW locations other than B Yard ("reassignment off B Yard").

/ / /

---

[4] Mr. Mangram supervised the B Yard second shift.

3

### Ms. Moore's Shift Change

In early November 2007, Marihelen Afonso ("Ms. Afonso") became acting Scheduling Nurse and scheduled all LVN's at VSPW. On November 12, 2007, Ms. Afonso switched Ms. Moore from the second (10 a.m. to 6 p.m) shift to the third (6 p.m. to 2 a.m.) shift ("shift reassignment") because:

1. Ms. Moore was registry nurse to perform temporary relief work;

2. Staffing for the third shift was insufficient but was sufficient for the second shift;

3. Ms. Moore had experience and training, unlike newer staff, and needed less supervision, and there were fewer supervisors on the third shift than there were on the second shift.

Ms. Moore attributes Ms. Afonso to have switched her to the third shift because prior to Ms. Afonso's becoming a scheduling nurse, Ms. Moore rejected Ms. Afonso's request to place an inmate on the telephone because medications were out.

### Ms. Moore's First Internal Discrimination Charge

Ms. Moore submitted to CDCR a November 27, 2007 discrimination complaint ("November 27 charge")[5] to check boxes for color, race and retaliation as the basis of her complaint. The November 27 charge references her preclusion of B Yard assignments "without notice" and that she was "constantly harrassed/slander [sic] put down to other state medical workers and supervisors on a daily basis while working on B medical."

### Ms. Tucker's Telephone Call To Ms. Moore's Residence

On November 13, 2007 in Ms. Afonso's office, Ms. Moore asked Ms. Afonso why Ms. Moore was not scheduled for B Yard, and Ms. Afonso threw Ms. Tucker's October 22, 2007 note ("October 22 note"), which stated: "Please do not utilize contract LVN Moore on Facility B clinic any longer. See me to explain." (Underlining in original.) Ms. Tucker orally explained to the scheduling nurse her intent to preclude Ms. Moore and Mr. Funch to work the B Yard during the same shift.

In late November 2007, Ms. Tucker telephoned Ms. Moore's residence ("residence call") in response to Ms. Moore's request for the October 22 note. Ms. Tucker explained to Ms. Moore that she would not give a copy of the October 22 note to Ms. Moore, whom Ms. Tucker characterizes as

---

[5] CDCR characterizes the November 27 charge as an internal Equal Employment Opportunity ("EEO") complaint.

4

becoming "very upset" and hung up the telephone. Ms. Moore attributes the residence call to upset Ms. Moore.

### Ms. Moore's Second Internal Discrimination Charge

Ms. Moore submitted to CDCR a November 30, 2007 discrimination complaint ("November 30 charge")[6] to check boxes for color, race and retaliation as the basis of her complaint. The November 30 charge references the residence call, preclusion of B Yard assignments, and shift changes. The November 30 charge claims that Mr. Funch treated her like a slave and was a racist but does not attribute specific racist conduct to Mr. Funch.

### Non-Written Response To Ms. Moore's Memorandum To Request Reassignment

Ms. Afonso received Ms. Moore's December 11, 2007 memorandum ("December 11 memorandum") to request reassignment to the second shift due to child care issues. Ms. Tucker directed Ms. Afonso not to respond to the December 11 memorandum ("non-response to December 11 memorandum") in writing because her status as a temporary registry worker did not merit a response.

Ms. Moore attributes the absence of Ms. Afonso's response to her December 11 memorandum as retaliation for submitting the November 27 charge and naming Ms. Afonso in it.

### January 4, 2007 Altercation With Ms. Afonso

On January 4, 2007, Ms. Moore called Ms. Afonso from within VSPW to advise that Ms. Moore was working the second shift because she did not know to which shift she was assigned. Following Ms. Tucker's directive, Ms. Afonso instructed Ms. Moore to go home and return for her scheduled third shift.

Ms. Moore went to Ms. Afonso's office and demanded a written response to her December 11 memorandum. Ms. Afonso told Ms. Moore that Ms. Afonso would not provide a written response and attributes Ms. Moore to say in an aggressive tone: "I'm going to get you and Judy Tucker's jobs." Ms. Moore rejected Ms. Afonso's directive to leave and advanced toward Ms. Afonso, who describes herself as in her 60s and substantially older and smaller than Ms. Moore. In her declaration, Ms. Afonso states:

> I felt threatened by Ms. Moore's aggressive tone of voice and behavior, as well as her refusal to leave. I was very frightened for my safety; I was really afraid for my life. Ms. Moore did not leave my office until I picked up my telephone – an action that sends

---

[6] CDCR characterizes the November 30 charge as an internal Equal Employment Opportunity ("EEO") complaint.

5

a message to correctional officers to respond to an emergency.

Ms. Afonso reported the incident with Ms. Moore ("January 4 incident") to Ms. Tucker, who arranged for review of the January 4 incident by the VSPW Threat Assessment Team ("threat team"), which comprises VSPW management and security. The threat team decided that the January 4 incident met criteria for workplace violence and to terminate Ms. Moore's services at VSPW.

SHC did not terminate the employment of Ms. Moore, who remained eligible for placement with other SHC clients.

### Ms. Moore's Claims

Ms. Moore proceeds on her second amended complaint ("SAC") which is disorganized, repetitive and difficult to discern. The SAC generally alleges that Mr. Funch racially harassed Ms. Moore, that CDCR did not adequately investigate or remediate the harassment after Ms. Moore reported it, and that for filing discrimination charges, Ms. Moore was subject to retaliation, including changed work assignments and inability to continue to work at VSPW.

## DISCUSSION

### Summary Judgment Standards

CDCR contends that Ms. Moore is unable to substantiate the SAC's Title VII hostile environment and retaliation claims to entitle CDCR to summary judgment. Ms. Moore's papers offer nothing substantive to oppose summary judgment.

F.R.Civ.P. 56(a) permits a party to seek summary judgment "identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought." "A district court may dispose of a particular claim or defense by summary judgment when one of the parties is entitled to judgment as a matter of law on that claim or defense." *Beal Bank, SSB v. Pittorino*, 177 F.3d 65, 68 (1st Cir. 1999).

Summary judgment is appropriate when the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." F.R.Civ.P. 56(a); *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The purpose of summary judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need

for trial." *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

On summary judgment, a court must decide whether there is a "genuine issue as to any material fact," not weigh the evidence or determine the truth of contested matters. F.R.Civ.P. 56(a), (c); *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82 S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986)

The evidence of the party opposing summary judgment is to be believed and all reasonable inferences from the facts must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

"[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990) *High Tech Gays*, 895 F.2d at 574. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment." *Nissan Fire*, 210 F.3d at 1103; *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) (F.R.Civ.P. 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make the showing sufficient to establish the existence of an element essential to that party's case, and

1  on which that party will bear the burden of proof at trial.")  "But if the nonmoving party produces
2  enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion."
3  *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.  "The amount of evidence
4  necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the
5  parties' differing versions of the truth at trial.'"  *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (quoting
6  *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-289, 88 S.Ct. 1575, 1592 (1968)).  "The mere
7  existence of a scintilla of evidence in support of the plaintiff's position will be insufficient."  *Anderson*,
8  477 U.S. at 252, 106 S.Ct. 2505.

9        As discussed below, CDCR eliminates factual issues and demonstrates that it is entitled to
10 judgment as a matter of law.  Ms. Moore's opposition papers present mere conclusory statements with
11 no facts showing the need for trial.

### Burden Shifting Framework

13       CDCR argues that the record lacks sufficient facts for Title VII retaliation and hostile
14 environment claims and that Ms. Moore is unable to satisfy the burden shifting framework to support
15 such claims.

16       For Title VII claims at issue here, the *McDonnell Douglas*[7] burden-shifting framework applies
17 in the absence of direct evidence to support Title VII claims.  *Metoyer v. Chassman*, 504 F.3d 919, 931
18 (9th Cir. 2007); *Miller v. Fairchild Industries, Inc.*, 797 F.2d 727, 730-731 (9th Cir. 1986) (order and
19 allocation of proof for retaliation claims follow familiar scheme announced in *McDonnell Douglas*).
20 "At the first step of *McDonnell Douglas*, the plaintiff must establish a prima facie case of discrimination
21 or retaliation."  *Metoyer*, 504 F.3d at 931, n. 6.  "If the plaintiff makes out her prima facie case of either
22 discrimination or retaliation, the burden then 'shifts to the defendant to articulate a legitimate,
23 nondiscriminatory reason for its allegedly discriminatory [or retaliatory] conduct.'"  *Metoyer*, 504 F.3d
24 at 931, n. 6 (quoting *Vasquez v. County of Los Angeles*, 349 F.3d 634, 640 (9th Cir. 2003)).

25       "Finally, at the third step of *McDonnell Douglas*, if the employer articulates a legitimate reason
26 for its action, 'the presumption of discrimination [or retaliation] drops out of the picture, and the plaintiff

---

[7] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1973).

may defeat summary judgment by satisfying the ususal standard of proof required'" under F.R.Civ.P. 56(c)(1). *Metoyer*, 504 F.3d at 931 (quoting *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006) (citations and internal quotation marks omitted)). If the employer carries its burden, plaintiff must have an opportunity to prove by a preponderance of evidence that the legitimate reasons offered by the employer were not its true reasons but were a pretext for discrimination. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089 (1981); *McDonnell Douglas*, 411 U.S. at 804; 93 S.Ct. 1817*; see Brundage v. Hahn*, 57 Cal.App. 4th 228, 66 Cal.Rptr.2d 830, 835 (1997). "If a plaintiff succeeds in raising a genuine factual issue regarding the authenticity of the employer's stated motive, summary judgment is inappropriate, because it is for the trier of fact to decide which story is to be believed." *Washington v. Garrett*, 10 F.3d 1421, 1432-1433 (9th Cir. 1993). The plaintiff is required to produce "specific, substantial evidence of pretext" to avoid summary judgment. *Collings v. Longview Fibre Co.*, 63 F.3d 828, 834 (9th Cir. 1995).

Despite the burden shifting, the ultimate burden of proof remains always with the plaintiff to show that the employer intentionally discriminated or retaliated against plaintiff. *See Burdine*, 450 U.S. at 253, 101 S.Ct. 1089; *Coleman v. Quaker Oats Co.,* 232 F.3d 1271, 1281 (9th Cir. 2000); *Rose v. Wells Fargo & Co.*, 902 F.2d 1417, 1420-1421 (9th Cir. 1990), *cert. denied,* 533 U.S. 950, 121 S.Ct. 2592 (2001).

### *Alternative Direct Evidence*

As an alternative to the *McDonnell Douglas* framework, a plaintiff responding to a summary judgment motion "may simply produce direct or circumstantial evidence demonstrating that a discriminatory [or retaliatory] reason more likely than not motivated [the employer]." *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1122 (9th Cir. 2004) (citation omitted). The "*McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613 (1985).

"When the plaintiff offers direct evidence of discriminatory [or retaliatory] motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial. . . . it need be 'very little.'" *Goodwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998) (quoting *Lindahl v. Air France*, 930 F.2d 1434, 1438 (9th Cir 1991)). "Direct evidence is evidence which, if believed,

proves the fact [of discrimination or retaliation] without inference or presumption." *Goodwin*, 150 F.3d at 1221 (citation omitted). "Direct evidence typically consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Coghlan v. American Seafoods Co. LLC.,* 413 F.3d 1090, 1095 (9th Cir. 2005).

With these evidentiary standards in mind, this Court turns to CDCR's challenges to Title VII retaliation and hostile environment claims.

### Title VII Retaliatory Hostile Enviornment

Title VII prohibits an employer "to discriminate against any of his employees . . . to discriminate against any individual . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. section 2000e-3(a). An "employer may be liable for a retaliation-based hostile work environment." *Ray v. Henderson*, 217 F.3d 1234, 1245 (9th Cir. 2000). As such, an employer may be liable for a hostile environment arising from retaliation to the same extent as a hostile environment based on plaintiff's protected class. CDCR explains that since a retaliatory hostile environment claim arises under Title VII's anti-retaliation provision, 42 U.S.C. section 2000e-3, protected opposition or participatory activity must be based on an unlawful employment practice prohibited by Title VII. That is, the complained of harassment must be directed toward a plaintiff's protected status as a Title VII whistleblower.

Next, this Court will turn to the prima facie elements of retaliatory hostile environment.

### Prima Facie Case Of Retaliatory Hostile Environment

To make out a prima facie case of retaliation, an employee must show that:

1. He/she engaged in a protected activity;
2. The employer subjected him/her to an adverse employment action; and
3. A causal link exists between the protected activity and the adverse action.

*Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1065-1066 (9th Cir. 2003); *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000); *Ray*, 217 F.3d at 1240.

#### *Protected Activity*

CDCR argues that Ms. Moore lacks a retaliatory hostile environment claim based on alleged

1  misconduct arising prior to her November 27 charge. CDCR reasons that prior to the November 27
2  charge, Ms. Moore had engaged in no protected activity to subject her to retaliation. CDCR continues
3  that Mr. Funch's alleged misconduct during October 16-22, 2007, after he returned to B Yard, is not
4  retaliation for protected activity.
5     CDCR is correct. The record reflects that Ms. Moore's first meaningful protected activity was
6  her November 27 charge. Prior to November 27, 2007, she had engaged in no protected activity to
7  support a retaliatory hostile environment claim.

8                                    ***Adverse Action***

9     "The antiretaliation provision protects an individual not from all retaliation, but from retaliation
10 that produces an injury or harm." *Burlington Northern and Sante Fe Ry. v. White*, 548 U.S. 53, 67, 126
11 S.Ct. 2405 (2006). A plaintiff's displeasure "by an employer's act or omission does not elevate that act
12 or omission to the level of a materially adverse employment action." *Blackie v. State of Maine*, 75 F.3d
13 716, 725 (1st Cir. 1996).
14    "[M]aterial adversity . . . is important to separate significant from trivial harms." *White*, 548 U.S.
15 at 68, 126 S.Ct. 2405. "An employee's decision to report discriminatory behavior cannot immunize that
16 employee from those petty slights or minor annoyances that often take place at work and that all
17 employees experience." *White*, 548 U.S. at 68, 126 S.Ct. 2405. "[O]nly non-trivial employment actions
18 that would deter reasonable employees from complaining about Title VII violations will constitute
19 actionable retaliation." *Brooks*, 229 F.3d at 928. A retaliation plaintiff "must show that a reasonable
20 employee would have found the challenged action materially adverse, which in this context means it well
21 might have dissuaded a reasonable worker from making or supporting a charge of discrimination."
22 *White*, 548 U.S. at 68, 126 S.Ct. 2405 (citations and internal quotations omitted). "[A]n action is
23 cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging
24 in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir.2000).
25    The materiality standard "is tied to the challenged retaliatory act, not the underlying conduct that
26 forms the basis of the Title VII complaint. By focusing on the materiality of the challenged action and
27 the perspective of a reasonable person in the plaintiff's position, we believe this standard will screen out
28 trivial conduct while effectively capturing those acts that are likely to dissuade employees from

complaining or assisting in complaints about discrimination." *White*, 548 F.3d at 69-70, 126 S.Ct. 2405. Moreover, the U.S. Supreme Court refers "to reactions of a reasonable employee because we believe that the provision's standard for judging harm must be objective. An objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings." *White*, 548 F.3d at 69-70, 126 S.Ct. 2405.

CDCR argues that Ms. Moore is unable to establish the adverse employment action element given the temporary relief of her nursing registry and floater status to permit CDCR to move Ms. Moore from Yard to Yard and shift to shift. CDCR continues that the residence call was not objectively an adverse action given that the residence call's purpose was for Ms. Tucker to respond to Ms. Moore's request for the October 22 note. CDCR contends that the non-response to the December 11 memorandum is not adverse action in that CDCR was not obligated to provide a written response and Ms. Moore lacked an objectively reasonable expectation for a written response given her status as a registry nurse employed by SHC, not CDCR. Lastly, CDCR notes that its decision to terminate use of Ms. Moore's services at VSPW was not adverse action in the absence of Ms. Moore's employment relationship with CDCR and her continuing employment with SHC.

CDCR is correct. The record creates no inferences that Ms. Moore suffered an adverse employment action to retaliate against her protected activity. Ms. Moore's status was to provide temporary relief nursing as CDCR deemed appropriate. Under the circumstances, none of the faults which Ms. Moore attributes to CDCR constitutes an adverse action.

### *Causal Nexus – Proximity*

To support an inference of retaliatory motive, the adverse action must have occurred "fairly soon after the employee's protected expression." *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1009-10 (7th Cir.2000). "That an employer's actions were caused by an employee's engagement in protected activities may be inferred from 'proximity in time between the protected action and the allegedly retaliatory employment decision.'" *Ray v. Henderson*, 217 F.3d 1234, 1244 (9th Cir.2000) (quoting *Yartzoff v. Thomas*, 809 F.2d 1371, 1371 (9th Cir.1987)). In addition, the plaintiff must make some showing sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had engaged in protected activity. *Raad v. Fairbanks North Star Borough School Dist.*, 323 F.3d 1185, 1197 (9th Cir.

2003).

CDCR points to the absence of Ms. Moore's protected activity and Ms. Tucker's knowledge of protected activity prior to the reassignment off B Yard. CDCR further points to the absence of Ms. Moore's protected activity prior to the shift reassignment and Ms. Afonso's retaliatory animus as Ms. Afonso had become the Scheduling Nurse just prior to the shift reassignment and lacked a reason to retaliate against Ms. Moore. Ms. Moore's opposition papers reflect the absence of Ms. Afonso's retaliatory animus by noting that "Afonso took it upon herself to personally place the plaintiff wher [sic] she wanted her . . . Plaintiff ask [sic] Afonso why the sudden change, Afonso would blame others."

CDCR notes that no facts support a causal nexus as to the residence call as Ms. Tucker was not named in the November 27 charge and lacks a retaliatory motive in that Ms. Tucker made the residence call responded to Ms. Moore's request for a written response to Ms. Moore's December 11 memorandum.

The record lacks facts of a causal nexus between Ms. Moore's limited protected activity and adverse action, of which the record reveals none. The causal nexus element is unsubstantiated.

### **Retaliatory Hostile Environment – CDCR's Legitimate Reason**

CDCR notes that even if Ms. Moore were able to establish a retaliatory hostile environment prima facie case, CDCR has established legitimate grounds for its handling of Ms. Moore.

If plaintiff establishes a prima facie case, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for adverse employment action. *McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. 1817; *Burdine*, 450 U.S. at 252-253, 101 S.Ct. 1089; *Coleman*, 232 F.3d at 1281; *Guz v. Bechtel Nat', Inc.*, 24 Cal.4th 317, 355-356, 100 Cal.Rptr. 352, 379 (2000);[8] *Brundage*, 57 Cal.App.4th at 236, 66 Cal.Rptr.2d at 835. A reason is "legitimate" if it is "facially unrelated to prohibited bias, and which if true, would thus preclude a finding of discrimination." *Guz*, 24 Cal.4th at 358, 100 Cal.Rptr.2d 352.

"The defendant's burden at this stage is one of production, not persuasion. The court may not

---

[8] Federal and California courts rely on federal interpretations of Title VII to interpret analogous FEHA provisions which prohibit unlawful discrimination. *Bradley v. Harcourt, Brace and Co.*, 104 F.3d 267, 270 (9th Cir. 1996); *Clark v. Claremont Univ. Ctr. & Graduate Sch.*, 6 Cal.App.4th 639, 662, 8 Cal.Rptr.2d 151 (1992).

make a credibility assessment." *Njenga v. San Mateo County Superintendent of Schools*, 2010 WL 1261493, at *14 (N.D. Cal. 2010) (citing *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097 (2000)). "The defendant need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. 254, 101 S.Ct. 1089.

CDCR argues that Ms. Tucker legitimately reassigned Ms. Moore off B Yard because of Ms. Moore's personality conflict with Mr. Funch, the absence of a known racial harassment claim, and Ms. Moore's status as a temporary registry nurse compared to Mr. Funch's civil service status. CDCR contends that Ms. Afonso legitimately switched Ms. Moore to the third shift to address a shortage of experienced nurses on the third shift and adequate staffing on the second shift. CDCR notes that Ms. Tucker legitimately made the residence call to respond to Ms. Moore's request to a written response to her December 11 memorandum. CDCR continues that non-response to Ms. Moore's December 11 memorandum was a legitimate means to address a temporary registry worker. CDCR concludes that it legitimately discontinued using Ms. Moore given the January 4 incident and threat team's assessment of the January 4 incident.

The record raises not doubts as to the legitimacy of CDCR's actions and responses to Ms. Moore, who manifested unrealistic expectations and demands. Under the circumstances and Ms. Moore's temporary relief status, this Court is not in a position to question the legitimacy of CDCR's handling of Ms. Moore.

### **Retaliatory Hostile Environment – Pretext**

CDCR argues that no facts support that CDCR's legitimate reasons for its decisions were a pretext for retaliation.

"If the employer has met its burden by showing a legitimate reason for its conduct, the employee must demonstrate a triable issue by producing substantial evidence that the employer's stated reasons were untrue or pretextual, or that the employer acted with a discriminatory animus, such that a reasonable trier of fact could conclude that the employer engaged in intentional discrimination or other unlawful action." *Cucuzza v. City of Santa Clara,* 104 Cal.App.4th 1031, 1038, 128 Cal.Rptr.2d 660 (2002). "If the defendant offers admissible evidence of a legitimate, nondiscriminatory reason for the claimed adverse action, the *McDonnell Douglas* framework and its presumption of discrimination

disappear, and the plaintiff is left to prove by a preponderance of the evidence that the reasons offered by the defendant are merely a pretext for discrimination." *Njenga*, 2010 WL 1261493, at *14 (citing *Reeves*, 530 U.S. 133, 143, 120 S.Ct. 2097 (2000)).

The "critical" issue at the pretext stage is whether the plaintiff produces "sufficient evidence to raise a triable issue of fact as to whether the reason proffered by [employer] . . . was a pretext for unlawful retaliation or discrimination. *Bergene v. Salt River Project Agr. Imp. and Power Dist.*, 272 F.3d 1136, 1141 (9th Cir. 2001); *see Manatt v. Bank of America,* N.A., 339 F.3d 792, 801 (9th Cir. 2003) ("Because [plaintiff] failed to introduce any direct or specific and substantial circumstantial evidence of pretext, summary judgment for the [defendant] must be affirmed."); *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983) (failure to "produce any specific, substantial evidence of pretext" support summary judgment for employer); *Brundage*, 57 Cal.App.4th at 236, 66 Cal.Rptr.2d at 835.

"In response to the defendant's offer of nondiscriminatory reasons, the plaintiff must produce 'specific, substantial evidence of pretext.'" *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994) (quoting *Steckl*, 703 F.2d at 393). In other words, the plaintiff "must tender a genuine issue of material fact as to pretext in order to avoid summary judgment." *Steckl*, 703 F.2d at 393. A "plaintiff cannot create a genuine issue of pretext to survive a motion for summary judgment by relying solely on unsupported speculations and allegations of discriminatory intent." *Crawford v. MCI Worldcom Communications, Inc.*, 167 F.Supp.2d 1128, 1135 (S.D. Cal. 2001); *see Horn v. Cushman & Wakefield Western, Inc.*, 72 Cal.App.4th 798, 85 Cal.Rptr.2d 459 (1999) ("conflict of evidence . . . not created by speculation or conjecture").

Moreover, legitimate, nondiscriminatory reasons "need not necessarily have been wise or correct" but must be "facially unrelated to prohibited bias." *Guz,* 24 Cal.4th at 358, 100 Cal.Rptr.2d 352 (2000); *see Kariotis v. Navistar Intern. Transp. Corp.,* 131 F.3d 672, 676 (7th Cir. 1997) (proffered reasons, if "nondiscriminatory on their face" and "honestly believed" by employer, will suffice even if "foolish or trivial or baseless").

CDCR points to an absence of evidence to support pretext. In her deposition, Ms. Moore admitted that she was unaware of any reason why Ms. Tucker was angry with Ms. Moore to result in her reassignment off B Yard. Ms. Moore speculated that Ms. Afonso assigned her the third shift because

Ms. Moore refused Ms. Afonso's request to put an inmate on the telephone. The residence call responded to Ms. Moore's demand for a written response to her December 11 memorandum. CDCR's position was that a temporary relief worker, such as Ms. Moore, was not entitled to a written response. CDCR discontinued Ms. Moore's services due to the January 4 incident, during which Ms. Moore refused to leave VSPW as instructed and threatened Ms. Afonso to require threat team action.

CDCR is correct that the record raises no inference of pretext for a retaliatory hostile environment. SAC claims based on a retaliatory hostile environment claim fail.

### Title VII Racially Hostile Environment

CDCR challenges a SAC claim based on a racially hostile work environment.

Title VII prohibits an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color . . ." 42 U.S.C. § 2000e-2(a)(1).

#### *Prima Facie Case*

To establish a prima facie hostile work environment claim under Title VII, a plaintiff "must raise a triable issue of fact as to whether (1) she was 'subjected to verbal or physical conduct' because of her race, (2) 'the conduct was unwelcome,' and (3) 'the conduct was sufficiently severe or pervasive to alter the conditions of [plaintiff's] employment and create an abusive work environment.'" *Manatt v. Bank of America, NA*, 339 F.3d 792, 798 (9th Cir. 2003) (quoting *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 817 (9th Cir.2002)).

#### *Severe And Pervasive Harassment*

Not all workplace conduct which may be described as harassment affects a term, condition, or privilege of employment. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399 (1986) (addressing sexual harassment claims under Title VII); *Aguilar v. Avis Rent A Car System, Inc.*, 21 Cal.4th 121, 129-130, 87 Cal.Rptr.2d 132, 138 (1999), *cert. denied*, 529 U.S. 1138, 120 S.Ct. 2029 (2000). For harassment to be actionable, it must be sufficiently severe and pervasive "to alter the conditions of [the victim's] employment and create an abusive working environment." *Meritor Savings*, 477 U.S. at 67, 106 S.Ct. 2399 (citation omitted); *Fisher v. San Pedro Peninsula Hosp.*, 214 Cal.App.3d 590, 608, 262 Cal.Rptr. 842 (1989). "[H]arassment consists of conduct outside the scope of necessary

job performance, conduct presumably engaged in for personal gratification, because of meanness or bigotry, or for other personal motives. Harassment is not conduct of a type necessary for management of the employer's business or performance of the supervisory employee's job." *Reno v. Baird*, 18 Cal.4th 640, 646-647, 76 Cal.Rptr.2d 499 (1998).

"The plaintiff must prove that the defendant's conduct would have interfered with a reasonable employee's work performance and would have seriously affected the psychological well-being of a reasonable employee and that she was actually offended." *Fisher*, 214 Cal.App.3d at 609-610, 262 Cal.Rptr. 842. If the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no actionable harassment. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21-22, 114 S.Ct. 367, 370-371 (1993).

"Harassment cannot be occasional, isolated, sporadic, or trivial[;] rather the plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature." *Fisher*, 214 Cal.App.3d at 610, 262 Cal.Rptr. 842. A plaintiff must prove more than a few isolated incidents of racial enmity. *Gilbert v. City of Little Rock*, 722 F.2d 1390, 1394 (8th Cir. 1983), *cert. denied*, 466 U.S. 972, 104 S.Ct. 2347 (1984); *Snell v. Suffolk County*, 782 F.2d 1094, 1103 (2nd Cir. 1986). "[S]imple teasing . . . offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 778, 118 S.Ct. 2275 (1998). "When the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, the law is violated." *Kelly-Zurian v. Wohl Shoe Co.*, 22 Cal.App.4th 397, 409, 27 Cal.Rptr.2d 457 (1994) (internal quotations and citations omitted).

The Ninth Circuit uses "a totality of the circumstances test to determine whether a plaintiff's allegations make out a colorable claim of hostile work environment." *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000). Factors considered include frequency, severity and level of interference with work performance and whether discriminatory conduct is physically threatening or humiliating or a mere offensive utterance. *Faragher v. City of Boca Raton*, 524 U.S. 775, 787-788, 118 S.Ct. 2275 (1998); *Brooks*, 229 F.3d at 924 (citing *Harris*, 510 U.S. at 23, 114 S.Ct. 367); *Lappin v. Laidlaw*

*Transit, Inc.*, 179 F.Supp.2d 1111 (N.D. Cal. 2001).

The Ninth Circuit applies a "reasonableness" approach to employer remedies to stop harassment:

> We too believe that remedies should be "reasonably calculated to end the harassment." *Katz*, 709 F.2d at 256. An employer's remedy should persuade individual harassers to discontinue unlawful conduct. We do not think that all harassment warrants dismissal, *Barrett*, 726 F.2d at 427; rather, remedies should be "assessed proportionately to the seriousness of the offense." *Dornhecker v. Malibu Grand Prix Corp.*, 828 F.2d 307, 309 (5th Cir.1987). Employers should impose sufficient penalties to assure a workplace free from sexual [or racial] harassment. In essence, then, we think that the reasonableness of an employer's remedy will depend on its ability to stop harassment by the person who engaged in harassment. In evaluating the adequacy of the remedy, the court may also take into account the remedy's ability to persuade potential harassers to refrain from unlawful conduct.

*Ellison,* 924 F.2d 872, 882 (9th Cir. 1991).

CDCR faults the lack of evidence to support a racially hostile work environment. CDCR notes the absence of evidence that the alarm incident was racially motivated. CDCR points to the record that Mr. Funch was overall rude and disrespectful despite the race or color of coworkers. CDCR relies on Ms. Moore's deposition testimony of Mr. Funch's ulterior motive to harass Ms. Moore in that she reported her suspicion that he stole medication. CDCR further challenges the severity of a few, sporadic and mildly racially insensitive jokes and remarks which Ms. Moore attributes to Mr. Funch.

The record lacks facts to raise factual issues as to a concerted pattern of harassment of a repeated, routine or a generalized nature. The record reveals that Mr. Funch was difficult and made sporadic racially insensitive comments. Nothing in the record suggests physically threatening or humiliating conduct toward Ms. Moore. No evidence is apparent that a racially hostile environment changed Ms. Moore's terms and conditions of employment, especially given that she continued working at VSPW after the shift reassignment and raised no further complaints about race.

### **Apparent F.R.Civ.P. 54(d) Request**

Ms. Moore appears to request a delay to rule on summary judgment motion until CDCR provides her access to Mr. Funch and Mr. Mangram or their declarations.

F.R.Civ.P. 54(d) permits delay on a summary judgment ruling:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> (1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

Nonmovants seeking to continue a summary judgment ruling "must show (1) that they have set forth in affidavit form the specific facts that they hope to elicit from further discovery, (2) that the facts sought exist, and (3) that these sought-after facts are 'essential' to resist the summary judgment motion." *State of California v. Campbell*, 138 F.3d 772, 779 (9th Cir.), *cert. denied*, 525 U.S. 822, 119 S.Ct. 64 (1998). In seeking F.R.Civ.P. 56(d) relief, a nonmovant "must make clear what information is sought and how it would preclude summary judgment." *Garrett v. City and County of San Francisco*, 818 F.2d 1515, 1518 (9th Cir.1987). "The burden is on the party seeking to conduct additional discovery to put forth sufficient facts to show that the evidence sought exists." *Volk v. D.A. Davidson & Co.*, 816 F.2d 1406, 1416 (9th Cir. 1987).

Ms. Moore offers no affidavit or declaration to satisfy F.R.Civ.P. 56(d). Ms. Moore appears to take the position that CDCR must provide her evidence to oppose summary judgment. Ms. Moore fails to specify facts she hopes to elicit, the existence of such facts, and their necessity to resist summary judgment, especially considering her ample opportunity to conduct discovery and failure to explain why she was unable to locate evidence to oppose summary judgment. Ms. Moore is entitled to no delay on summary judgment.

## CONCLUSION AND ORDER

For the reasons discussed above, this Court:

1.  GRANTS CDCR summary judgment;
2.  DIRECTS the clerk to enter judgment in favor of defendant California Department of Corrections and Rehabilitation and against plaintiff Candy Q. Moore and to close this action; and
3.  VACATES the December 4, 2012 pretrial conference and the January 29, 2012 trial.

IT IS SO ORDERED.

**Dated:   October 23, 2012**                    /s/ Lawrence J. O'Neill
                                                              UNITED STATES DISTRICT JUDGE